**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------

|  |  |  |
|---|---|---|
| In re | : | Chapter 7 |
|  | : |  |
| John Hixson, | : |  |
|  | : | Case No. 05-47016 (AJG) |
|  | : |  |
| Debtor. | : |  |
|  | : |  |

--------------------------------------------------------

|  |  |  |
|---|---|---|
| John Hixson, | : |  |
|  | : |  |
| Plaintiff, | : | Adv. Pro. No. 06-01349 (AJG) |
|  | : |  |
| v. | : |  |
|  | : |  |
| U.S. Department of Education, | : |  |
|  | : |  |
| Defendant. | : |  |
|  | : |  |

--------------------------------------------------------

**OPINION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**


**APPEARANCES:**

PIRRO AND CHURCH
50 Washington Street, 4th Floor
Norwalk, CT 06855

      By:  Karen Marie Tobin, Esq.

Attorney for Plaintiff


PREET BHARARA
U.S. Attorney for the Southern District of New York
86 Chambers Street
New York, NY 10007

      By:  Serrin Turner, Esq.
      Assistant U.S. Attorney

Attorney for Defendant

**ARTHUR J. GONZALEZ**
**Chief United States Bankruptcy Judge**

Before the Court are cross-motions filed by the plaintiff, John Hixson (the

"Plaintiff" or "Hixson" or the "Debtor") and the U.S. Department of Education (the

"DOE" or the "Defendant") seeking summary judgment on the issue of whether a portion

of an educational consolidation loan (the "Consolidation Loan") corresponding to the

amount obtained by his ex-wife to finance her education, for which entire amount the

Plaintiff and his ex-wife are jointly and severally liable, may be discharged under section

523(a)(8)[1] of the Bankruptcy Code on the basis of undue hardship.  In particular, the

Plaintiff does not contend that the amount of the Consolidation Loan that corresponds to

his own educational loan is dischargeable.  Rather, he argues that the portion of the

Consolidation Loan corresponding to his ex-wife's education should be discharged

because he is not the beneficiary of the education for which the debt was incurred and

that rendering that portion of the Consolidation Loan non-dischargeable imposes an

---

[1] Section 523(a) provides, in relevant part:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not
> discharge an individual debtor from any debt—
> [(1) through (7) omitted]
> (8) unless excepting such debt from discharge under this paragraph would impose an
> undue hardship on the debtor and the debtor's dependents, for--
> (A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a
> governmental unit, or made under any program funded in whole or in part by a
> governmental unit or nonprofit institution; or
> (ii) an obligation to repay funds received as an educational benefit, scholarship, or
> stipend; or
> (B) any other educational loan that is a qualified education loan, as defined in section
> 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an
> individual[.]

11 U.S.C. § 523(a)(8) (Westlaw 2011) (effective April 1, 2007 to March 31, 2010).

undue hardship that meets the three-prong *Brunner* test.[2]  Thus, he believes he is entitled

to a discharge of that portion of the Consolidation Loan that corresponds to the amount of

his ex-wife's loan.

There is no genuine issue as to any material fact.  After considering the Parties'

cross-motions for summary judgment and the Parties' joint stipulation of facts (the

"Stipulation"), because the application of the plain meaning of the statute requires a

showing of undue hardship, regardless of whether each of the co-obligors was the initial

borrower under a loan that was subsequently consolidated, and because the Plaintiff has

failed to meet the *Brunner* test with respect to the Consolidation Loan, or any portion

thereof, the Court finds that the DOE is entitled to judgment as a matter of law.

## I. Jurisdiction and Venue

The Court has subject matter jurisdiction over this adversary proceeding under

sections 1334(a) and (b) and 157(a) and (b) of title 28 of the United States Code and

under the July 10, 1984 "Standing Order of Referral of Cases to Bankruptcy Judges" of

the United States District Court for the Southern District of New York (Ward, Acting

C.J.).  This is a core proceeding within the meaning of section 157(b)(2)(I) and (J) of title

28 of the United States Code.  Venue is proper before this Court pursuant to section

1409(a) of title 28 of the United States Code.

## II. Procedural History

On October 14, 2005, the Debtor filed a voluntary chapter 7 petition.  On March

14, 2006, the Debtor initiated an adversary proceeding against the DOE.  The Adversary

Proceeding Cover Sheet indicated that the nature of the suit was a motion to discharge a

student loan due to hardship.  (ECF No. 1.)  The verified complaint (the "Verified

---

[2] *Brunner v. N.Y.S. Higher Educ. Servs.*, 831 F.2d 395, 396 (2d Cir. 1987).

Complaint") relating to the adversary proceeding (the "Adversary Proceeding") was filed

the next day on March 15, 2006. (ECF No. 2.)  On June 8, 2006, the DOE filed an

Answer to Amended Complaint.[3]  At a pre-trial conference on December 6, 2006, each

side sought to file summary judgment motions.  Both sides argued that a hearing on the

motions was not necessary and that the Court could rule based upon the pleadings that

would be filed in support of the corresponding motions.  Thereafter, the parties (the

"Parties") both filed their pleadings with the Court on January 22, 2007.  The DOE then

filed a Memorandum in Opposition to Plaintiff's Motion for Summary Judgment on

February 5, 2007.  (ECF No. 10.)

No hearing took place and the matter was taken "under advisement."  However,

the Court failed to place this matter on its *sub judice* (under advisement) list and, as a

result, the continued pendency of the matter went unnoticed.  Recently, upon a general

review of motions pending on its docket, it came to the Court's attention that the

summary judgment motions had not been decided.[4]

### III. Facts

Hixson is a musician who trained at the Julliard School.  He majored in Clarinet

and graduated with a masters degree in 1994 and a doctoral degree in 1998.  (Stip. 2 ¶ 6.)

On March 16, 1999, Hixson and Ulla Suokko ("Suokko," and together with Hixon, the

"Spouses"), to whom he was then married, obtained the Consolidation Loan from the

---

[3] The Adversary Proceeding Cover Sheet and Verified Complaint were initially docketed under the chapter 7 case (the "Case") on March 13, 2006.  (ECF Nos. 4, 5.)  Notations were made on the docket indicating that the two documents should have been filed on the docket of the Adversary Proceeding.  The Court has not discerned any difference in content between the Verified Complaint filed under the Case and the Verified Complaint filed under the Adversary Proceeding upon examination of the contents of both complaints.  Thus, it is unclear why the DOE considered the complaint filed by the Debtor as an amended complaint.
[4] The Court notes that during the pendency of these motions, neither counsel for the DOE nor counsel for the Debtor called to the Court's attention the fact that the motions remained pending.

DOE.  (*Id.* at 1 ¶ 1.)  The Consolidation Loan represented amounts totaling $91,566 that

Hixson originally borrowed and amounts totaling $47,551 that Suokko originally

borrowed.  (*Id.* ¶ 2.)  Hixson signed as the borrower for the Consolidation Loan and

Suokko co-signed as his spouse.  (*Id.* at 2 ¶ 4.)  They later divorced in October 2000.

(*Id.*)  The promissory note (the "Note") for the Consolidation Loan contains provisions

specific to a consolidation loan entered into jointly between a borrower and a spouse.

(*Id.* ¶ 5.)  Significantly, the Note provides that the Spouses

> confirm that [they] are legally married to each other and understand and
> agree that [they] are and will continue to be held jointly and severally
> liable for the entire amount of the debt represented by the Federal Direct
> Consolidation Loan without regard to the amounts of [their] individual
> loan obligations that are consolidated *and without regard to any change
> that may occur in [their] marital status*. . . . [They] understand that this
> means that one of [them] may be required to pay the entire amount due if
> the other is unable or refuses to pay.

(*Id.*) (Emphasis supplied.)

As of the Stipulation dated January 12, 2007, Hixson worked full-time as the

Senior Account Executive for Patron Technology, an online marketing software and

consulting company serving the arts and culture industry.  (*Id.* ¶ 7.)  For the year 2005,

Hixson's W-2 Wage and Tax Statement reported total compensation of $58,301.68 from

Patron, less $19,243.61 in withheld taxes, resulting in an average pay of approximately

$3,255 per month after taxes.  (*Id.*)  As of 2007, Hixson's earnings from his position at

Patron Technology are comparable to the 2005 figures.  (*Id.* at 3 ¶ 7.)  Hixson also earns

additional money as a part-time professional musician.  (*Id.* ¶ 8.)  His average monthly

expenses, which total approximately $1,983 per month, include expenses for the

following:  rent, food, clothing, laundry, medical and dental expenses, transportation,

recreation, clubs, entertainment, newspapers, and magazines, charitable contributions,

and business-related expenses.  (*Id.* ¶ 9.)  The Parties stipulate that Hixson is in good

health, has no dependents, and is able to afford a minimal standard of living in his present

circumstances.[5]  (*Id.* ¶¶ 10, 11, 12.)

From June 1999 to December 2000, Hixson made eleven payments on the loan of

approximately $440 each.  (*Id.* ¶ 13.)  He stopped making voluntary payments on the

Consolidation Loan after December 2000.  (*Id.*)  From October 14, 2004 through

November 3, 2005, the DOE garnished Hixson's wages in bi-weekly payments ranging

from $221.55 to $584.70.  (*Id.*)  On October 14, 2005, after Hixson filed his Chapter 7

bankruptcy petition, he received a refund in the amount of $702.15 for wages garnished

after the bankruptcy filing.  (*Id.*)  Unlike Hixson, Suokko never made any payments on

the Consolidation Loan, and as of the date of the Stipulation in January 2007, the DOE

had not pursued collection payments from her.  (*Id.* ¶ 14.)

The Parties stipulate that as of December 13, 2006, the outstanding balance on the

Consolidation Loan was $195,229.41 and that the interest rate on the Consolidation Loan

was 5.30 percent.  (*Id.* ¶ 15.)  Additionally, assuming an Adjusted Gross Income of

$58,301, Hixson would be required to repay the outstanding balance on the Consolidation

Loan under a standard plan (the "Standard Plan") or income contingent payment plan (the

"Income Contingent Plan").  (*See id.* at 4 ¶ 16.)  Under the Standard Plan, Hixson would

make monthly payments of $2,099.45 over a 120-month term, totaling $251,934,

---

[5] The Court assumes the parties wrote this statement in the context of Hixson's ability to pay back the
Consolidated Loan while maintaining a minimal standard of living.  However, it remains unclear under
which of the two repayment options the parties refer to in the Stipulation when discussing Hixson's
"present circumstances."  Prior to filing, Hixson had been making payments through a garnishment of his
wages in bi-weekly amounts ranging from $221.55 to $584.70 (approximately $443.10 to $1,169.30 per
month).  (Stip. 3 ¶ 13.)  The Standard Repayment Plan would require payments in the amount of $2,099.45
each month, while the Income Contingent Plan would require $808.35 each month.  (*Id.* at 4 ¶ 16.)  Since
the Income Contingent Plan would require payments that approximate what Hixson had previously been
paying, the Court believes the referenced paragraphs of the Stipulation refer to the Debtor's standard of
living under the Income Contingent Plan.

inclusive of principal and interest.  (*Id.*)  Under the Income Contingent Plan, Hixson

would make monthly payments of $808.35 over a 251-month term, totaling $356,362.49,

inclusive of principal and interest.  (*Id.*)  These amounts were derived from the "Income

Contingent Repayment Calculator" accessible from the DOE website.  (*See id.*)

Finally, the Parties stipulate that should Hixson remarry, the payments required

under the Income Contingent Plan would be adjusted to take into account the greater size

of his household and any income earned by his future spouse.  (*Id.* ¶ 17.)

### IV. Discussion

***Summary Judgment***

Rule 56(a) of the Federal Rules of Civil Procedure, incorporated into bankruptcy

practice by Rule 7056 of the Federal Rules of Bankruptcy Procedure, provides that

summary judgment shall be rendered "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  A party asserting "that a fact cannot be or is genuinely disputed

must support the assertion by:  (A) citing to particular parts of material in the record . . . ;

or (B) showing that the materials cited do not establish the absence or presence of a

genuine dispute, or that an adverse party cannot produce admissible evidence to support

the fact."  Fed. R. Civ. P. 56 (c)(1).

"Rule 56(a) specifies that to preclude summary judgment, the fact in dispute must

be material.  Substantive law determines the facts that are material."  *Cordius Trust v.*

*Kummerfeld* (*In re Kummerfeld*), No. 09 B 16267 (AJG), Adv. No. 10-2841 (AJG), 2011

WL 108339, at *9 (Bankr. S.D.N.Y. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986)).  "If a fact is material, it is necessary to see if the dispute about that

material fact is genuine, 'that is, if the evidence is such that a reasonable jury could return

a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby*, 477 U.S. at

248). "If the fact may be reasonably resolved in favor of either party, then there is a

genuine factual issue that may only be resolved by the trier of facts and summary

judgment will be denied." *Id.* (citing *Anderson v. Liberty Lobby*, 477 U.S. at 250). "If,

however, the evidence 'is so one-sided that one party must prevail as a matter of law,'

then summary judgment will be granted." *Id.* (quoting *Anderson v. Liberty Lobby*, 477

U.S. at 251-52).

The Parties agree that there are no genuine issues of material fact, having entered

into the Stipulation and thereafter filing cross-motions for summary judgments. There

are only two issues for the Court to resolve. First, the Court must decide whether the

undue hardship standard under section 523(a)(8) of the Bankruptcy Code applies in the

same manner to an obligor under a consolidation loan regardless of whether that obligor

was the borrower of a loan that a debtor became liable for as a result of consolidation of

that person's loans with those of a spouse. Stating the issue another way, whether the

undue hardship analysis includes facts and circumstances regarding whether a co-obligor

under a consolidated loan actually received an educational benefit for each of the loans

subject to the consolidation. Second, the Court must decide whether requiring a debtor to

remain liable for a consolidated loan, including a portion corresponding to the amount

obtained by a co-obligor to finance the non-debtor co-obligor's education, would result in

an undue hardship pursuant to section 523(a)(8) of the Bankruptcy Code under the three-

prong *Brunner* test.

**Undue Hardship Standard Applies to Each Co-obligor on the Consolidation Loan**

Hixson argues in the Brief in Support of Plaintiff's Motion for Summary Judgment that while "ordinarily he would be required to prove that the discharge of his student loan would be contingent upon a showing of 'undue hardship' pursuant to 11 U.S.C. 523(8)(a) [sic], he should be awarded a discharge of the portion of his loans attributable to Ella Suokko," since failure to except the portion of the Consolidation Loan corresponding to Suokko's education would be contrary to the intent of the drafters. Hixson contends that it is not the purpose of the statute to burden someone such as himself with a debt which he "never 'rightfully owed'."[6]  He cites to, *inter alia*, *Griffin v. Oceanic Contractors,* 458 U.S. 564 (1982) to support his argument that a strict application of the *Brunner* test is inapposite in his situation, where it would result in "an outcome completely in contradiction to the intent of the . . . drafters."  Hixson reasons that a plain reading of the statute would produce a result contrary to the intent of the drafters because the exception to dischargeability was not meant to allow a student to derive an education by obtaining an educational loan, to subsequently shift liability to one's spouse who is himself a student, and to thereafter "walk away from any responsibility for the loan," thus enjoying the benefits of the education for which the loan was incurred.

The DOE responds that this Court does not have the discretion to ignore the "undue hardship" requirement as set forth under section 523(a)(8).  They argue that Hixson is not entitled to a discharge of the Consolidation Loan corresponding to his

---

[6] In maintaining that he never "rightfully owed" the debt, Hixson argues that it is not fair to hold him accountable for the debt of his ex-wife; however, he does not seem to contend, nor are there any facts to support an assertion that, as a legal matter he is not liable under the Note.  To the extent it could be argued that Hixson actually challenges his obligation under the Consolidation Loan, the Court finds that in signing as co-obligor for the Consolidation Loan, Hixson became jointly and severally liable for the entire amount of the debt under the Consolidation Loan without regard to the amount of his individual loan obligation.

wife's education because section 523(a)(8) does not turn on whether the debtor was the

beneficiary of the Consolidation Loan.  Since the statutory text is unambiguous, reference

to legislative history is not required, and, to the extent legislative history is used to

interpret the provision, the purpose of the statute supports its plain meaning.  The DOE

further contends that section 523(a)(8) makes no distinction between a debtor who

received the benefit of the education and a debtor who was not a beneficiary of the loan.

Drawing such a distinction, they argue, would undermine the purpose of the statute.

The U.S. Supreme Court has acknowledged in *Griffin* that where the literal

application of a statute produces a result "demonstrably at odds with the intentions of its

drafters . . . those intentions should be controlling."  *Griffin v. Oceanic Contractors, Inc.*,

458 U.S. at 571.  In such a case, the spirit of the law, rather than its plain meaning, should

govern.  *Stein v. Bank of New England, N.A.* (*In re Stein*), 218 B.R. 281, 286 (Bankr. D.

Conn. 1998).  Here, the application of section 523(a)(8) does not conflict with the

intentions of the drafters, nor does the spirit of the law conflict with the plain meaning of

the statute.

While it is true that Congress intended to prevent those who borrow to obtain the

benefit of a superior education from receiving a discharge of the obligation to repay the

loan, "legislative history clearly bears out that the broad purpose of the provision was to

keep our student loan programs intact."  *In re Karben*, 201 B.R. at 684 (internal quotation

marks omitted).  Section 523(a)(8) and its legislative history do not specifically reference

a situation where a co-obligor on an educational loan would not be the person who

received the benefit of the loan.  The statute's historical context shows a Congressional

concern over the abuse of the bankruptcy laws by individuals who obtain student loans to

finance their education and who subsequently file bankruptcy petitions in order to obtain

a discharge without any attempt to repay the loan. *Correll v. Union Nat'l Bank of*

*Pittsburg* (*In re Correll*), 105 B.R. 302, 304 (Bankr. W.D. Pa. 1989). "[L]egislative

history indicates a Congressional policy of excepting discharge in those inequitable

situations where debtors with superior education and employment skills were

intentionally abusing the fresh start policies . . . [of] the bankruptcy laws." *Id. Accord In*

*re Wells*, 380 B.R. at 659. The statute was also enacted "to preserve the financial

integrity of the loan system by assuring the availability of monies to students in the

future." *In re Wells*, 380 B.R. at 659 (citing *Kentucky Higher Educ. Assist. Auth. v.*

*Norris* (*In re Norris*), 239 B.R. 247, 253 (M.D. Ala. 1999); *In re Hamblin*, 277 B.R. at

682)). Holding Hixson liable for the educational loan of his ex-wife would not conflict

with, or be contrary to, either purpose of the statute, i.e., keeping government educational

loan programs intact and preventing abuse of the bankruptcy laws.

"In the absence of clearly expressed contrary legislative intent, the statutory

language must be regarded as conclusive." *In re Pelkowski*, 990 F.2d 737, 741 (3d Cir.

1993) (citing *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108

(1980); *United States v. Bey*, 736 F.2d 891, 893 (3d Cir. 1984)). The language of section

523(a)(8) is unambiguous. *See e.g., Hamblin v. Educ. Credit Mgmt. Corp.* (*In re*

*Hamblin*), 277 B.R. 676, 679 (Bankr. S.D. Miss. 2002). *Accord Wells v. Sallie Mae* (*In*

*re Wells*), 380 B.R. 652, 659 (Bankr. N.D.N.Y. 2007). Its plain meaning shows that

"educational loans are non[-]dischargeable regardless of whether the borrower was the

student." *In re Stein*, 218 B.R. at 286. Section 523(a)(8) "does not refer to a 'student

debtor' but applies to limit discharge of any 'individual debtor' from 'any debt' for a

covered educational loan." *In re Pelkowski*, 990 F.2d at 741. "The relevant inquiry into the applicability of this section is the purpose of the loan, not the beneficiary of the education." *Educ. Res. Inst., Inc. v. Varma* (*In re Varma*), 149 B.R. 817, 818 (N.D. Tex. 1992). *Accord In re Wells*, 380 B.R. at 659 (citing *Palmer v. Student Loan Fin. Corp.* (*In re Palmer*), 153 B.R. 888, 895 (Bankr. D.S.D. 1993); *Karben v. ELSI* (*In re Karben*), 201 B.R. 681, 685 (Bankr. S.D.N.Y. 1996)). Holding Hixson liable for the educational loan of his ex-wife comports with the plain meaning of the statute, which excepts from discharge any debt incurred by an individual debtor for an educational loan covered by the statute.

Section 1078-3 on federal consolidation loans of title 20, chapter 28 of the United States Code[7] provides the statutory authority for married couples to agree to be held jointly and severally liable for the repayment of a consolidation loan by, among other things, treating the couple as an "individual." Specifically, section 1078-3(a)(3)(C)(i) provides:

> A married couple, each of whom has eligible student loans, may be treated as if such couple were an individual borrowing under subparagraphs (A) and (B) [defining "eligible borrower" and when the status of an "eligible borrower" terminates] if such couple agrees to be held jointly and severally liable for the repayment of a consolidation loan, without regard to the amounts of the respective loan obligations that are consolidated, and without regard to any subsequent change that may occur in such couple's marital status.

20 U.S.C.A. § 1078-3(a)(3)(C)(i) (Westlaw 2011), *stricken by* Deficit Reduction Act of 2005, Pub. L. No. 109-171, 120 Stat. 164 § 8009 (2006).

Had Congress thought it necessary to ameliorate the effects of the undue hardship standard for a loan incurred by the other spouse upon which the debtor-spouse becomes

---

[7] 20 U.S.C. § 1078-3(a)(3)(C)(i) was effective from October 1, 1998 to February 7, 2002, and covers 1999, the year in which Hixson and Suokko obtained the Consolidation Loan.

liable, particularly after a change in marital status, then Congress would have amended section 523(a)(8) to reflect such policy. However, Congress did not do so.

Hixson's argument that the portion of the Consolidation Loan corresponding to his ex-wife's education should be excepted from discharge is based on an interpretation of the statute that is contrary to its plain meaning, which plain meaning excepts from discharge any debt of an individual debtor, as long as it is an educational loan contemplated by the statute. It is undisputed that Hixson signed as the borrower for the Consolidation Loan. (Stip. 2 ¶ 4.) It is also undisputed that the loans are "student loans" that were consolidated under a "Federal Direct Consolidation Loan" program of the DOE. (*Id.* at 1 ¶ 1.) Thus, because the application of the plain meaning of the statute requires a showing of undue hardship by a debtor, regardless of whether that debtor, as a co-obligor, received the educational benefit of each loan that was subsequently consolidated, the Debtor must demonstrate that he has satisfied the three-prong *Brunner* test.

### Application of the Brunner Test

Hixson asserts that the burden of having to pay his ex-wife's student loan as well as his own imposes an undue hardship that meets the three-prong *Brunner* test, thus entitling him to a discharge of that portion of the Consolidation Loan corresponding to his ex-wife's loan. The DOE, in contrast, argues that Hixson can pay off the entire amount of the Consolidation Loan without undue hardship.

The *Brunner* test, which is the controlling precedent in the Second Circuit, *see In re Stein*, 218 B.R. 281, 287 (Bankr. D. Conn. 1998), provides that a finding of "undue hardship" to except an educational loan from discharge requires a three-part showing:

13

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for [himself] and [his] dependents if forced to repay the loans;

(2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and

(3) that the debtor has made good faith efforts to repay the loans.

*Brunner*, 831 F.2d at 396.

The Debtor has the burden of proving the *Brunner* elements by a preponderance of the evidence. *In re Wells*, 380 B.R. at 658.

Hixson argues, *inter alia*, that he has satisfied the *Brunner* test because: (a) the fact that the basis for the debt was a loan program that was "short-lived" and that he belongs to a small class of debtors whose marriages later resulted in divorce, show that he is faced with "unique" and "exceptional" circumstances; (b) the result of collection efforts by the DOE would result in Hixson paying for the education of a former wife, and would result in his future wife and future children paying the portion of Suokko's loan; (c) circumstances rendering him unable to benefit from the education obtained by Suokko will not change, noting that he would never benefit from it at the outset; and (d) he is acting in good faith because he has availed himself of the Income Contingent Plan and has allowed the garnishment of his wages to satisfy the Consolidation Loan.

Hixson does not contend that the amount of the Consolidation Loan that corresponds to his own educational loan is dischargeable. Rather, he argues that the portion of the Consolidation Loan corresponding to his ex-wife's education should be discharged because he is not the beneficiary of the education for which the debt was incurred.[8] As noted above, however, whether the Consolidation Loan was made for the

---

[8] The law regarding whether a court may grant a partial discharge of student loans is unsettled. While "not all courts have agreed to consider a partial discharge of a student loan obligation . . . other courts have

benefit of Hixson's ex-spouse is irrelevant to the *Brunner* analysis.  The first and second

prongs of the *Brunner* test weigh the debtor's ability to repay the loan, while the third

prong considers the debtor's history of repayment.  The test does not require an analysis

of the manner in which the loan was incurred.  Any such extension of the *Brunner* test

would be inconsistent with the plain meaning of section 523(a)(8).

### (1) Minimal Standard of Living

The first prong of *Brunner* requires a showing that "the debtor cannot maintain,

based on current income and expenses, a 'minimal' standard of living for [himself] and

[his] dependents if forced to repay the loans[.]"  *Brunner*, 831 F.2d at 396.  This prong

"requires more than a showing of tight finances," *Penn. Higher Educ. Assist. Agency v.

Faish* (*In re Faish*), 72 F.3d 298, 306 (1995), and is not met "merely because repayment

of the borrowed funds would require some major personal and financial sacrifices."  *Id.*

However, "[w]here a family earns a modest income and the family budget, which shows

no unnecessary or frivolous expenditures is still unbalanced, a hardship exists from which

a debtor may be discharged of his student loan obligations."  *In re Correll*, 105 B.R. at

306.  "[T]his test requires the Court to examine the Debtor's current income and expenses

and determine a flexible minimal standard of living level sensitive to the particular

circumstances of each case through the application of common sense."  *In re Stein*, 218

B.R. at 287.

---

found authority pursuant to Code § 105(a) to allow a partial discharge of student loans provided that the
debtor is able to establish undue hardship as to that portion of the debt sought to be discharged."  *In re
Wells*, 380 B.R. at 662-63 (citations omitted) (internal quotations omitted).  *See also In re Pincus*, 280 B.R.
303, 311 (Bankr. S.D.N.Y. 2002) ("In applying the *Brunner* test, the question arises whether a court must
aggregate a debtor's student loans and determine their dischargeability as a whole, or whether a court's
analysis may be conducted on a loan-by-loan basis . . . .  A third possibility arises as to whether a court may
partially discharge a single student loan obligation on the theory that the debtor can repay a portion of it
without undue hardship.").  Since the Court finds the Debtor is able to sustain a minimal standard of living
while repaying the entire loan, the Court need not consider whether a partial discharge would be
appropriate.

Hixson cites the district court decision of *In re Brunner*, 46 B.R. 752, 755 (S.D.N.Y. 1985) (the "District Court Decision"), which was affirmed by the Second Circuit, in support of his argument that he has satisfied the *Brunner* test insofar as he is faced with "unique" and "exceptional" circumstances because the basis for the debt was a loan program that was "short-lived,"[9] and because he belongs to a small class of debtors whose marriages later resulted in divorce. (Pl.'s Mem. 5.) Thereafter, Hixson discusses how he has met the second and third prongs of the *Brunner* test. (*See* Pl. Mem. 6.)

However, Hixson raises the issue of unique and exceptional circumstances under the wrong prong in the *Brunner* test, and uses it out of context. In his argument, Hixson misreads the sentence in the District Court decision that provides: "this test has been formulated as the necessity of showing 'unique' or 'exceptional' circumstances." *In re Brunner*, 46 B.R. at 755. The phrase "this test" does not refer to the *Brunner* test in its entirety, and does not require a showing of "unique" or "exceptional" circumstances under which the loan was incurred, but to the second prong of the *Brunner* test, which requires a showing of unique and exceptional circumstances demonstrating that the debtor's "current inability to pay will extend for a significant portion of the repayment period of the loan." *In re Brunner*, 46 B.R. at 755. *Accord In re Brunner*, 831 F.2d at 396 (affirming the District Court Decision).

Hixson further argues that requiring him to pay for the portion of the loan corresponding to Suokko's education would constitute an undue hardship because he

---

[9] The Debtor argues that the Consolidation Loan "was available for only [two] years before the program was terminated due to concerns that it could not be split in divorce." (Pl.'s Mem. 1.) However, even if the Court accepts this assertion as accurate, the fact that the Consolidation Loan was "short-lived" does not impact the Court's reasoning. The broad language of the statute, which includes both student-obligors and non-student-obligors, as well as the Congressional intent to prevent abuse of the bankruptcy process and to "preserve the financial integrity of the loan system" *In re Wells*, 380 B.R. at 659, lead the Court to conclude that in order for the Debtor to except the portion of the Consolidation Loan at issue from discharge, the Debtor must demonstrate undue hardship under the *Brunner* test.

16

would be paying for the loan of someone to whom he is no longer married, which would also impose a hardship on his future wife and future children, who would be burdened by his former wife's loan. In considering whether a debtor would be able to maintain a minimal standard of living, a court will ascertain future expenses from an extrapolation of present needs. *In re Brunner*, 46 B.R. at 754, *aff'd* 831 F.2d 295 (2d Cir. 1987). Thus, the appropriate place to take into consideration a known future change in the debtor's finances is the first prong of the *Brunner* test. *See In re Harris,* 103 B.R. 79 (Bankr. W.D.N.Y. 1989) (considering in the first prong of the *Brunner* test future increased weekly child support payments due to the pending birth of debtor's third child).[10]

However, Hixson does not present any calculations to support his argument that he would be unable to maintain a minimal standard of living, based on his current income and expenses, were he to remarry. Even if Hixson were to provide such calculations as to the impact a future wife and child would have on his ability to maintain a minimal standard of living, such calculations would have been purely speculative and would not have an impact on this Court's analysis under the first prong of the *Brunner* test. *See generally In re Brunner*, 46 B.R. at 754 (recognizing that marriage is unpredictable and could "quickly wreck havoc with [a] budget" but also noting that it is this very unpredictability of future finances that led courts to require the debtor to demonstrate "additional circumstances which *strongly suggest* that the current inability to pay will extend for a significant portion of the repayment period of the loan.") (emphasis added).

---

[10] This Court's approach in *In re Thoms*, 257 B.R. 144, 149 (Bankr. S.D.N.Y. 2001) was not consistent with the court's analysis in *In re Harris*. Upon further reflection, the Court finds the *Harris* approach to be more appropriate. In determining a debtor's current ability to repay a loan, a court should consider in the first prong known future changes that may impact the debtor's future ability to pay.

Hixson cannot demonstrate that he would be unable to maintain a minimal standard of living if he remains obligated to repay the full amount of the Consolidation Loan. Hixson concedes that he is able to meet a minimal standard of living in his present circumstances.[11] (Stip. 3 ¶ 12.) As the Parties stipulated, Hixson makes over $58,000 per year, which amounts to approximately $3,255 per month after taxes. Hixson's total monthly expenses amount to $1,983, resulting in disposable income of at least $1,272 per month, from which he could make the $808 monthly payments that would be required of him were he to pay off the *entire* Consolidation Loan under the Income Contingent Plan. Hixson would still be left with $464 in income at the end of each month. Given that repayment of the entire amount of the Consolidation Loan under the Income Contingent Plan would result in Hixson being able to maintain a minimal standard of living, and because repayment of the portion of the Consolidation Loan corresponding to Suokko's education would still allow Hixson to maintain a minimal standard of living, the Court holds that the Plaintiff has failed to meet the first prong of the *Brunner* test.

### (2) Persistence of Condition

Since the Court has found that Hixson is able to maintain a minimal standard of living even if required to pay the *entire* amount of the Consolidation Loan, it is unnecessary for the Court to inquire any further. "If one of the requirements of the Brunner test is not met, the bankruptcy court's inquiry must end there, with a finding of no dischargeability." *In re Faish*, 72 F.3d at 306. *See also In re Wells*, 380 B.R. at 661

---

[11] As discussed, *supra*, the Court believes the Stipulation refers to the Debtor's standard of living under the Income Contingent Plan. Even if the parties were referring to the Standard Repayment Plan, however, the Court could still consider whether Hixson could make the minimum payments under the Income Contingent Plan. *See, e.g., In re Thoms*, 257 B.R. at 149 (finding although debtor could not afford to make monthly payments under the loan's current repayment terms, debtor still failed to meet the first prong of the *Brunner* test because there were "many options available to the Debtor to attempt to restructure the debt . . . [including] income contingent repayment plans.").

(noting that because the debtor was unable to satisfy one prong of the *Brunner* test, it was unnecessary for the Court to analyze the remaining prong).

Had an examination of Hixson's financial condition under the first prong of *Brunner* revealed that it was unclear whether Hixson could meet a minimal standard of living if required to repay the Consolidation Loan, the Court would have considered the second prong of the *Brunner* test. *See In re Wetzel*, 213 B.R. 220, 226 (Bankr. N.D.N.Y. 1996). The second prong "requires that the Debtor prove more than his present inability to pay his student loan obligations. He must also establish that his current financial hardship is likely to be long-term." *In re Wells*, 380 B.R. at 659. The Court would consider whether "unique" and "exceptional" circumstances beyond the reasonable control of the Debtor prevent him from obtaining future employment and affect his ability to repay the debt. *Id.* at 659-60. However, where, as here, there is no doubt that the Debtor is able to afford a minimal standard of living, *see* Stip. 3 ¶¶ 12, an analysis under the second prong of the *Brunner* would add nothing to the Court's consideration of the Debtor's financial hardship.

### (3) Good Faith

The Court will nevertheless address the last prong of the *Brunner* test for the sake of fullness. The third prong requires the Debtor to show he has made a good faith effort to repay the loan. *In re Brunner*, 831 F.2d at 396. "[A] *good faith* attempt at full repayment [is] 'measured by [the Debtor's] efforts to obtain employment, maximize income and minimize expenses[.]'" *In re Stein*, 218 B.R. at 288 (emphasis in original) (citation omitted). The Debtor must exert reasonable efforts to insure repayment. *Id.* (citing *Brunner*, 831 F.2d at 397).

The Parties stipulated that Hixson made eleven voluntary payments on the Consolidation Loan from June 1999 to December 2000 and stopped making voluntary payments after December 2000. (Stip. 3 ¶ 13.)  The Parties also stipulated that from October 14, 2004 through November 3, 2005, the DOE garnished Hixson's wages in bi-weekly payments.  (*Id.*)

Hixson argues that he has satisfied the third prong of *Brunner* because he had allowed his wages to be garnished and had thus entered into an income contingent plan with the DOE.  However, the DOE argues that Hixson's failure to make voluntary payments on the Consolidation Loan at a time when he was financially capable of doing so negates a finding of good faith.  Further, the DOE emphasizes that wage garnishments cannot be characterized as a voluntary effort by the Plaintiff to enter into a repayment program.

While the Court recognizes that Hixson previously made eleven voluntary payments on the Consolidation Loan, which are an indication of good faith, Hixson subsequently failed to make further voluntary payments.  Where a debtor has had the opportunity to repay an amount, but did not; where "[n]o factors beyond [the] [d]ebtor's reasonable control precluding repayment have been suggested[;]" and where the debtor simply ignores his obligation, such conduct does not satisfy the third prong of the *Brunner* test.  *Lehman v. N.Y. Higher Educ. Servs. Corp.* (*In re Lehman*), 226 B.R. 805, 809 (Bankr. D. Vt. 1998).  While Hixson argues that allowing his wages to be garnished is an indication of good faith, the nature of wage garnishment is contrary to the concept of voluntary payment.  *See* 34 C.F.R. § 668.35(b)(2)(ii) ("Voluntary payments are those payments made directly by the borrower, and do not include payments obtained by

Federal offset, garnishment, or income or asset execution.").  Since Hixson failed to make voluntary payments after his initial eleven payments even when he had the opportunity to do so, and because Hixson did not present circumstances beyond his reasonable control that precluded repayment, the Court concludes that Hixson has failed to meet the good faith requirement of *Brunner*.

### Failure to Pursue Collection against a Co-Obligor

Hixson posits that since this Court is a court of equity, the DOE has a reciprocal duty to act in good faith, which duty the DOE violated in pursuing collection solely against the Debtor despite the DOE's knowledge of the divorce of the Spouses, and despite its knowledge that Suokko was employed.

Although the DOE admits it has not pursued collection payments from Suokko, *see* Stip. 3 ¶ 14, this alone does not establish bad faith on the part of the DOE.  The Spouses are jointly and severally liable for the entire amount of the debt under the Consolidation Loan; one Spouse may be required to pay the entire amount due regardless of whether the other Spouse is able or offers to pay.  (Stip. 2 ¶ 5.)  It is a fundamental tenant of joint and several liability that the DOE may bring a claim for payment against either of the obligors.  *See, e.g., U.S. v. Rigas*, 490 F.3d 208, 223 n. 19 (2d Cir. 2007) ("[A] bank has the right to collect from either co-borrower on a loan that provides for joint and several liability if the loan is overdue . . . .").  To the extent Hixson pays more than his share of the loan, he may bring a claim for indemnity under state law against Suokko.  *See Univ. Reinsur. Co. Ltd. v. St. Paul Fire and Marine Ins. Co.*, 2001 WL 585638, at * 5 (S.D.N.Y. 2001) (finding that an absent co-obligor remains liable for contribution to the other co-obligor who pays the judgment by suit) (citing *Greenleaf v.*

*Safeway Trails, Inc.*, 140 F.2d 889, 890 (2d Cir. 1994)).  The pursuit of payment from one obligor over another is not an indication of bad faith on the part of the DOE.

Further, even if Hixson had established that the DOE acted in bad faith, such a finding would have no impact on this Court's analysis under the *Brunner* test.[12]  The Court's consideration of the dischargeability of the Consolidation Loan turns on whether the loan at issue is owed by the Plaintiff, which it is, and whether the Plaintiff can repay the loan without suffering undue hardship, which he can.

In sum, the *Brunner* test applies in the same manner to each of the obligors under a consolidation loan.  The *Brunner* test does not take into consideration the factors concerning the circumstances under which any of the loans were subsequently consolidated.  The focus of the *Brunner* test is upon the facts and circumstances relevant to the consequences of the repayment of the debt at issue and the good faith of the Debtor regarding the history of his efforts to pay.

## V. Conclusion

Since the Debtor has failed to satisfy the three elements of the *Brunner* test, he cannot show undue hardship and his student loans are not subject to discharge.  For the foregoing reasons, the Plaintiff's request to except the portion of his debt related to his wife from discharge under section 523(a)(8) of the Bankruptcy Code on the basis of undue hardship should be **DENIED** and the Defendant's motion for summary judgment should be **GRANTED**.

---

[12] It appears to the Court that if bad faith were found, such a finding would not be part of the "undue hardship" analysis.  However, a debtor would not be precluded from pursuing other forms of relief based upon such conduct.

Counsel for the DOE is to settle an order consistent with this opinion.


Dated:  New York, New York
        March 24, 2011


                          **s/Arthur J. Gonzalez**
                          ARTHUR J. GONZALEZ
                          CHIEF UNITED STATES BANKRUPTCY JUDGE